IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTOPHER M. HANTAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.  09-cv-0930-MJR-PMF |
| ) | |
| VILLAGE OF PONTOON BEACH, ) | |
| ILLINOIS, AARON MORGAN, CHRIS ) | |
| MODRUSIC, and CHIEF CHARLES ) | |
| LUEHMANN, individually and in their ) | |
| official capacities, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM AND ORDER

REAGAN, District Judge:

    **A.**    <u>**Introduction**</u>

Before the Court is the Motion for Summary Judgment (Doc. 41), filed by Defendants Village of Pontoon Beach ("the Village"), Chief Charles Luehmann, Officer Chris Modrusic and Officer Aaron Morgan.  Defendants move for summary judgment against Plaintiff Christopher Hantak ("Hantak") on all seven counts of his complaint (Doc. 4).  This action arises from events that transpired in the late evening and early morning hours of November 8–9, 2008, outside Mac & Mick's Sports Bar in Pontoon Beach, Illinois. That night, an altercation in the parking lot between an off-duty, probationary, St. Louis Metropolitan Police Department  ("SLMPD") officer and other bar patrons led to the shooting of non-party, Jeff Bladdick.  Then, in the ensuing chaos, Hantak—also an off-duty,

probationary SLMPD officer—was shot twice by Defendant, Village of Pontoon Beach police officer, Aaron Morgan. On November 5, 2009, Hantak filed a seven-count complaint raising the following claims:

Count One  Pursuant to 42 U.S.C. §§ 1983, 1988, excessive use of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution against Officer Morgan;

Count Two  § 1983 failure to intervene against Officer Modrusic;

Count Three  § 1983 civil conspiracy against Chief Luehmann and Officers Morgan and Modrusic;

Count Four  § 1983 failure to train under *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978), against Chief Luehmann and the Village of Pontoon Beach;

Count Five  State law assault and battery against Officer Morgan

Count Six  State law civil conspiracy against Officers Morgan and Modrusic and Chief Luehmann

Count Seven  Respondeat superior, under state law, against the Village of Pontoon Beach

Defendants claim they are entitled to summary judgment on all claims because "there is no evidence of a constitutional violation, the individual defendants are entitled to qualified immunity, and there is no evidence to support the state law claims" (Doc. 41, ¶ 5). Hantak has responded that, given the large number of widely varying eye-witness accounts, genuine issues of material fact exist, precluding summary judgment (Doc. 48). Defendants' motion has been fully briefed, the Court has thoroughly reviewed the extensive record and now rules as follows.

B.     **Background**

On summary judgment, the Court considers the facts in a light most favorable to the non-moving party (here, Hantak), and adopts reasonable inferences and resolves doubts in favor of that party. *Nat'l Athletic Sportswear, Inc., v. Westfield Ins. Co.,* 528 F.3d 508, 512 (7th Cir. 2008). On November 8, 2008, Hantak, at least three other probationary, off-duty SLMPD officers, and some other friends went to Mac & Mick's Sports Bar to continue celebrating a birthday and engagement party. There was a large crowd at the bar that evening (Doc. 42, Ex. 1, p. 44); and Hantak was carrying his department-issued service weapon with him (*Id.*, Ex. 3, pp. 47-48). Hantak consumed roughly five beers and two mixed drinks throughout the course of the evening, starting around eight or nine p.m.; but according to at least one witness—a bartender—he did not appear intoxicated (*Id.* at 43, 51; Doc. 48, Ex. 2, pp. 11-13).

Sometime around 1:00 a.m., while Hantak was still in the bar, an altercation arose in the parking lot of Mac & Mick's during which one of Hantak's companions—off-duty, probationary SLMPD Officer Bryan Pour ("Pour")—shot another bar patron (Doc. 48, Ex. 1, pp. 54-55; Doc. 42, Ex. 6, pp 18-19). When Hantak heard that a shot had been fired he quickly exited the bar, drew his service weapon, placed his badge—which was hanging on a lanyard—outside of his shirt, and immediately went to assist Pour (Doc. 48, Ex. 1, pp. 95-96, 117, 122). After speaking with Pour and another companion, all Hantak knew was that Pour had been in a fight and was beat-up, and that some unknown person had been shot; Hantak then started looking for that individual (*Id.* at 114).

There were people all over the parking lot running to their cars, trying to leave, and the scene was chaotic (*Id.* at 97, 108). Hantak attempted to secure the scene, telling people to stay where they were until the police arrived (*Id.* at 108, 111). Hantak was displaying his weapon, but he claims that he had both hands on it at all times, that he kept it pointed downward to the ground, and that he never waived it, or pointed it at anyone (*Id.* at 117-122). At some point, while Hantak was canvassing the parking lot, Village of Pontoon Beach Police Officer Aaron Morgan ("Morgan") arrived on the scene, and Officer Chris Modrusic ("Modrusic") arrived shortly after him (Doc. 42, Ex. 22, p. 52). The next thing Hantak remembers is being shot (Doc. 48, Ex. 1, p. 154). Hantak claims he never saw the uniformed officer who shot him, never saw anyone holding a gun, and never heard any command to drop his weapon (*Id.* at pp. 154-155).

According to Officers Morgan and Modrusic, they were dispatched to Mac & Mick's due to a fight in progress with shots fired (Doc. 42, Ex. 22, p. 42-44). The Officers drove to the bar with their overhead lights and sirens activated, and on the way a dispatcher reported additional shots fired, man down (*Id.* at pp. 42, 57). Upon arriving, Officer Morgan parked near the front driveway, got out of his car, drew his weapon, and was met by a Mac & Mick's employee who said, "he's shooting him, he's shooting him right now" (*Id.* at pp. 54, 56-57, 59). Officer Morgan then ran to the parking lot, which was full of cars, and saw people screaming, one person running and one person lying on the ground; he asked some bystanders where the shooter was and they pointed in the direction of a dark colored truck and several other cars (*Id.* at pp. 61-64, 85). Morgan proceeded

about 20 feet in that direction and saw two men, one holding the other up against the truck with hands behind his back as if he was being handcuffed (*Id.* at 66-68). At this point, for the first time, Morgan saw Hantak on the far side of the truck, about six feet from him; Hantak was holding a weapon to his chest (*Id.* at 69-72). Morgan claims he yelled, three times, in quick succession, "police, drop your gun"; and that Hantak, who was facing him, responded by moving his gun toward Morgan (*Id.* at 74, 76-77). Morgan then rapidly discharged his semi-automatic weapon three times, with two of the shots striking Hantak (*Id.* at 85-86). Hantak claims that one of the shots struck him in the right, upper neck and the bullet exited his face, but the Defendants' claim that Hantak was shot in the face. Morgan prepared his police report of the shooting a couple of weeks after the incident; all officers involved were assisted in preparing their reports by a Police Benevolent and Protective Association attorney in Springfield, Illinois (Doc. 48, Ex. 9, pp. 16, 21).

Police Chief Charles Luehmann ("Luehmann") arrived at Mac & Mick's about one hour after the shooting (Doc. 42, Ex. 24, p. 14). Detective Schardan, a Sergeant with the Village's police department, told Luehmann that he had called the Illinois State Police and that they would be taking over the investigation (*Id.* at 17-18). Apparently, none of the officers involved, nor Chief Luehmann, were ever questioned or contacted by the Illinois State Police (Doc. 48, Ex. 9, pp. 107-108; Ex. 25, pp.70, 79; Ex. 27, pp. 22, 49-51). Chief Luehmann was unaware of any department training on an officer's use of deadly force or duty to intervene, except for "roll call" training where policies are reviewed at the beginning of a shift (Doc. 48, Ex. 27, p. 56).

### C. <u>Analysis</u>

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial.… A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations omitted).

Thus, in responding to a summary judgment motion, the non-moving party may not simply reiterate the allegations contained in the pleadings; more substantial evidence must be presented at this stage. Moreover, a genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 at 252. Finally, credibility determinations and evidence weighing must be left to the trier of fact—in this case a jury. *Id.* at 255.

1. § 1983 Excessive Force and Failure to Intervene Claims

The facts offered by the parties in support of their arguments present a chaotic, rapidly changing scene with at least fifteen separate eye witness accounts, primarily from sources who were intoxicated to varying degrees. The Seventh Circuit Court of Appeals has noted, "multiple versions of the facts increases the chances that at least one of those conflicting facts will be material to the outcome of the case." *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006). Indeed, such is the case here where, based upon numerous, widely varying accounts of the events at issue, the Court can clearly identify significant disputes of material fact, requiring a trial on these two claims.

There is no dispute that Officer Morgan effectively "seized" Hantak, within the meaning of the Fourth Amendment, when he used deadly force against Hantak by shooting at him three times. *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002), *citing Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable."). Thus, here, the primary issue is: whether, under the standards established by the Fourth Amendment, Officer Morgan acted reasonably when he shot Hantak.

Under the Fourth Amendment, an officer's use of force is unreasonable "only if, 'judging from the totality of the circumstances at the time of the [incident], the officer used greater force than was reasonably necessary....'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009), *quoting Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987). The reasonableness of a particular use of force is determined at the moment of the incident, and

"judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As a result, inquiring into an excessive force claim "nearly always requires a jury to sift through disputed factual contentions and to draw inferences therefrom." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

Such is the case here where a number of key, material facts regarding the reasonableness of Officer Morgan's actions are in dispute. For example, it is disputed whether Morgan ever commanded Hantak to drop his weapon. It is disputed whether Hantak was facing Morgan, or had is back turned away from Morgan, when he was shot. And, while it is not disputed that Hantak was holding a weapon when he was shot, the exact position and movement (or lack thereof) of his weapon at the time of the shooting is disputed. The parties also dispute exactly what information Morgan possessed at the time he shot Hantak; for example, whether or not Morgan was aware that Hantak (and others on the scene) was an off-duty SLMPD officer. These particular facts are material because they factor into the reasonableness of Morgan's use of deadly force. The Court agrees with Defendants that the reasonableness of Morgan's actions is determined from his perspective at the time of the events. However, on summary judgment, the facts and circumstances must be taken in a light most favorable to Hantak. Given the clearly disputed nature of a number of material facts, Hantak's excessive force claim is not a viable candidate for summary judgment. The issue of whether, in this situation, it was objectively reasonable for Officer Morgan to use deadly force against Hantak thus must proceed to trial.

While it is a closer issue, Hantak's failure to intervene claim against Officer Modrusic also must proceed to trial. Modrusic may be held liable for his alleged failure to intervene in Morgan's allegedly unconstitutional acts only if: (1) he had reason to know that Morgan was using excessive force on Hantak (or committing some other constitutional violation), or if he was deliberately indifferent to Morgan's actions; *and* (2) "if he had a realistic opportunity to intervene to prevent the use of excessive force." *Lanigan v. Vil. of E. Hazel Crest,* 110 F.3d 467, 478 (7th Cir. 1997); *see also Abdullahi*, 423 F.3d at 774, *quoting Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994).

Here, both prongs of the above failure to intervene analysis are disputed because the parties disagree over when Officer Modrusic arrived on the scene, and whether he was present and nearby during the shooting. The parties agree that Officer Morgan was the first to arrive on the scene and that Officer Modrusic arrived sometime thereafter. However, the timeline between Morgan's arrival on the scene, the shooting of Hantak, and when Modrusic arrived is disputed. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan*, 110 F.3d at 478. Given the short amount of time that elapsed between Morgan's arrival on the scene and his shooting of Hantak, (*see* Doc. 48, p. 27, "ten seconds"), it is difficult to see exactly how Modrusic could have intervened. Nevertheless, because both the surrounding timeline and Modrusic's location in relation to Morgan at the time of the shooting are in dispute, a jury must decide this claim.

2. <u>Officers Morgan & Modrusic's Qualified Immunity Defense</u>

Both parties paint a picture of a chaotic, rapidly changing scene in which Officers Morgan and Modrusic undoubtedly were forced to make a number of quick and difficult decisions. These facts alone, however, are not enough to make their actions objectively reasonable. Because of the significant number of disputed, material facts, a jury must determine the reasonableness of their actions. Further, these disputed facts are enmeshed with, and directly impact, the Officers' claim that they are entitled to qualified immunity. It follows then that their qualified immunity defense must also be denied.

On summary judgment, the Court makes two key inquiries in evaluating qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff[ ], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). "[T]he court may decide these questions in whatever order is best suited to the case at hand." *Id.*, *citing Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). In some circumstances, however, the analysis of whether there is a genuine issue of material fact and the analysis of whether the defendant is entitled to qualified immunity effectively collapses into one inquiry. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Such is the case here.

As the Court explained in detail above, Hantak has put forth sufficient evidence, when taken in a light most favorable to him, to show that Defendants *may* have violated his Fourth Amendment rights. Specifically, Hantak alleges that Officer Morgan

used excessive force against him when he was shot, and that Officer Modrusic failed to intervene; which, if true, would amount to an unreasonable seizure, and a constitutional violation. *Gonzalez*, 578 F.3d at 541. Thus, Hantak has satisfied the first prong above.

Regarding the second prong, it is a plaintiff's burden to show that the constitutional right in question was clearly established. *Id.* at 540, *citing Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). A plaintiff may do so "by showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Id.*, *citing Smith v. Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). However, "[w]hen the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Id.*, *citing Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Finally, in determining whether Hantak has shown that his Fourth Amendment right was clearly established, *in these particular circumstances*, the Court "must accept [his] account of those circumstances." *Gonzalez*, 598 F.3d at 541.

Based on Hantak's account, it was clearly established at the time he was shot that officers may not, without provocation and without prior warning, use deadly force against a suspect who is armed, but allegedly holding his weapon in an unthreatening manner and not attempting to flee. *See, e.g., Estate of Starks v. Enyart*, 230, 233-34 (7th Cir. 1993). It was also clearly established that, if possible, an officer should act to prevent such a violation from occurring. Ultimately, here, the correct resolution of the second prong of the qualified immunity inquiry hinges upon numerous disputed material facts. As a result, neither defendant is entitled to qualified immunity.

### 3. § 1983 Monell Claims against Chief Leuhmann and the Village

In Count Four of his complaint, and pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), Hantak claims that Chief Luehmann and the Village violated his constitutional rights by failing to train, supervise, control, and/or discipline Officers Morgan and Modrusic (Doc. 4, p. 12). Hantak alleges that "pervasive" policies or customs, practices and usages of the police department or Village, caused his constitutional deprivations or, in the alternative, that Defendants training was inadequate. More specifically, Hantak attempts to establish the requisite "policy or custom" by showing that there was an unauthorized, but widespread practice by the Village: (1) to use excessive force; (2) to ignore policies and procedures, (3) to engage in a cover-up in order to "insulate officers from sanctions"; and (4) to fail to adequately train, supervise and or discipline officers (Doc. 4, ¶ 57). *See Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

Hantak, however, has not presented any definite, competent evidence regarding any unauthorized policy by the Village or police department to use excessive force, or to engage in cover ups in order to insulate officers from sanctions; only mere conclusions and this is not enough. *See Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Further, actions that frustrate or violate City policies and practices (i.e., number two above) cannot be the basis for holding a municipality liable under *Monell*. *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992). As a result, Hantak's only *Monell* claim that has any potential merit is his claim regarding the Village police department's alleged failure to adequately train its officers in the use of deadly force.

Neither a municipality nor a supervisor may be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). For a municipality to be liable, there must be a direct causal link between the municipal policy or custom and the alleged constitutional deprivation. *See Monell*, 436 U.S. at 694. Most pertinent to the case at bar, "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). However, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Canton*, 489 U.S. 378, 390 n. 10, *citing Tennessee v. Garner*, 471 U.S. 1 (1985) (internal quotations omitted). Finally, deliberate indifference can be established either from a "failure to provide adequate training in light of foreseeable consequences[, or from a] failure to act in response to repeated complaints of constitutional violations by its officers." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006).

The Defendants have put forth some evidence regarding the amount of training that they received as police officers, generally (*see* Doc. 54, p. 11). However, Hantak has also put forth some evidence that the police department's deadly force training indeed may have been inadequate. For example, Chief Luehmann could not identify any training that his department had provided in the lawful use of deadly force; allegedly,

there was no use of force training documented in Officer Morgan's file, and the only ongoing training of any kind identified by Luehmann was "roll call" training during shift changes. Thus, while the overall evidence supporting this claim is scant, there are genuine issues of material fact precluding summary judgment.

The court notes however that "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Jenkins*, 487 F.3d at 492. As a result, this *Monell* claim is secondary to Hantak's claims of excessive force and failure to intervene; if a jury finds that Officers Morgan and Modrusic acted reasonably, then neither Chief Luehmann nor the Village may be held liable for their alleged failure to adequately train these officers.

    4. § 1983 Conspiracy and State Law Conspiracy Claims

Properly alleging a civil conspiracy requires facts supporting "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). Thus, the lynchpin to a conspiracy is an agreement. If the agreement is not overt, then the alleged acts must sufficiently imply a mutual understanding or "meeting of the minds"; "[meaning,] the acts performed by the members of the conspiracy are unlikely to have been undertaken without an agreement." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000), *quoting Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir. 1991). However, conspiracy claims that "are vague, conclusory and include no overt acts reasonably related to the promotion of the alleged conspiracy," will not survive summary judgment. *Id.*

Because Hantak's conspiracy claims are vague, conclusory and not supported by any competent evidence, they cannot survive summary judgment.[1] Hantak alleges the following "circumstantial evidence" in support of his conspiracy claims: Morgan, in violation of Department policy, did not prepare a police report of the shooting prior to his administrative leave; no one from the Department asked Morgan what happened before he shot Hantak; Morgan was instructed by Modrusic not to talk to anyone about the shooting and later, the two officers met with an attorney in Springfield, Illinois prior to preparing their police reports on the shooting; Chief Luehmann was unaware of any other time when police reports were prepared this way; and finally, the Department did not conduct any investigation into the shooting and Chief Luehmann never asked the Illinois State Police (ISP) for the results of its investigation (*see* Doc. 48, p. 31). The problem with all of the alleged facts above is that they do not support, as a *reasonable* inference, a tacit agreement between Defendants. Hantak would have this Court equate silence and lack of investigation with conspiracy, but that is not enough. As Defendants point out, the ISP was handling the investigation of the shooting; so it was reasonable for the Village Police Department to take a hands-off approach. At bottom, Hantak's "bald assertions," with only circumstantial evidentiary support, are not enough to establish a genuine fact issue regarding whether defendants conspired to deprive him of his constitutional rights. *See Amundson*, 218 F.3d 712 at 718.

---

[1] The Court has lumped together the analysis of Hantak's state common law and § 1983 civil conspiracy claims because there is no substantial difference between the two. To show a civil conspiracy under Illinois law, Hantak "must show an agreement to accomplish either an unlawful purpose or a lawful purpose by unlawful means. *Mosley v. City of Chicago*, 614 F.3d 391, 399 (7th Cir. 2010), *citing McClure v. Owens Corning Fiberglas Corp.*, 720 N.E. 2d 242, 258 (1999).

### 5. State Law Assault and Battery and *Respondeat Superior* Claims

The Court can quickly sum up the posture of Hantak's two remaining state law claims. "Under Illinois law, battery is the 'unauthorized touching' of another that 'offends a reasonable sense of personal dignity.'" *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008), *quoting Cohen v. Smith*, 648 N.E.2d 329, 332 (1995). Here, there is no question that the facts alleged, if accepted by a jury, would more than adequately meet this definition. However, the Illinois Tort Immunity Act "shields public employees from liability for actions committed 'in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.'" *Id.* at 692-93, *quoting* 745 ILCS 10/2-202. Further, in Illinois, a police officer's conduct is willful and wanton only if he acts with "actual or deliberate intention to harm or with an utter indifference or conscious [or reckless] disregard for the safety of others." *Id.*, *quoting Breck v. Cortez*, 490 N.E. 2d 88, 94 (1986); *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1080-81 (7th Cir. 1998). Finally, regarding Hantak's claim of vicarious liability against the Village "an employer is liable for an intentional tort committed by its employee only if the tort was in furtherance of his employment, that is, only if the employee's motive, or at least *a* motive, in committing the tort was to serve his employer." *Doe v. City of Chicago*, 360 F.3d 667, 670 (7th Cir. 2004), *citing, e.g., Wright v. City of Danville*, 675 N.E. 2d 110, 117-18 (Ill. 1996)

Thus, because of the Illinois Tort Immunity Act, if the jury finds that Officer Morgan acted reasonably the night of the shooting, then he cannot be held liable for assault or battery under Illinois law, and no vicarious liability may attach to the Village.

Alternatively, if the jury finds that Officer Morgan acted unreasonably by using excessive force, and thus violated Hantak's Fourth Amendment rights, then the jury would have to additionally find that Morgan's conduct was also "willful or wanton" for him (and, potentially, the Village) to be liable on the state law tort claim of assault and battery. In other words, Hantak's claim of excessive force against Officer Morgan is the lynchpin and gatekeeper for any or all of his other remaining claims to possibly proceed forward.

### D.  Conclusion

In sum, the Defendants' Motion for Summary Judgment (Doc. 41) is DENIED in part, and GRANTED in part. The motion is DENIED as to the following five claims brought by Plaintiff Christopher Hantak: Count One, pursuant to 42 U.S.C. §§ 1983, 1988, for excessive use of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution, against Officer Morgan; Count Two, for failure to intervene, against Officer Modrusic; Count Four, pursuant to § 1983 and *Monell v. Dep't of Social Services*, 436 U.S. 658, 690 (1978), for a failure to train, against Chief Luehmann and the Village of Pontoon Beach; Counts Six, under Illinois state tort law, for assault and battery against Officer Morgan, and Count Seven, also under Illinois law, for Respondeat superior, against the Village of Pontoon Beach. However, Count Four (*Monell*, failure to train claim) will be presented to the jury only if there is a finding of culpability on Count One.

Summary Judgment is GRANTED as to the following two claims only: Counts Three and Six, Hantak's § 1983 and Illinois State law civil conspiracy claims against Officers Morgan and Modrusic, and Chief Luehmann. Accordingly, Counts Three and Six are hereby DISMISSED with prejudice.

In light of the foregoing, at the close of this action, *after* the Jury Trial on the remaining counts is complete, Judgment SHALL be entered in favor of Defendants and against Plaintiff Christopher Hantak on Counts Three and Six of his complaint (Doc. 4).

IT IS SO ORDERED.

DATED December 14, 2010.

/s/ *Michael J. Reagan*
MICHAEL J. REAGAN
United States District Judge